Good morning. My name is Elizabeth Walker and I'm here on behalf of Appellant Mr. Michael Green. I'd like to take just a minute and deal with the arguments regarding the sliding scale and the deference that should be given to Lena's decision in this case. First, I'll say that with all due respect, the district court was incorrect with its conclusions regarding the questions that were put to Lena's second medical reviewer, Dr. George Yannick. The district court concluded that there was nothing improper about those questions and stated specifically that Lena did not submit the same questions three times. With respect, that was not the issue that... Or maybe just those first two questions were irrelevant, poorly stated, not really to the point. I mean, that is certainly possible, Your Honor, but as we made, to the point we made in our reply brief, Lena is a very sophisticated operation. They regularly submit these questions to medical reviewers. They submitted the first question they submitted to George Yannick. That doesn't mean all questions given by such organizations are always good. That's true, Your Honor, but the first question submitted to George Yannick was also submitted to their first medical reviewer, Dr. Sami Kamju, and they seemed to have no problem with that because Dr. Kamju's response permitted them to deny Mr. Green's benefit. Well, is it your position that just because they asked multiple questions that there's some irregularity associated with that? No, Your Honor. It's not that they asked multiple questions. The questions seemed to be phrased such to elicit their ability to deny Mr. Green's benefit. Well, if they were phrased so that they can ask more precisely a question, and if we're not assuming the doctor lied, then why is that a problem? If they asked inartful questions and they realized that they weren't getting an answer that clearly responded to the point in question, what's wrong with that? I believe, Your Honor, that what's wrong with that is that they asked the question that elicited the response that they wanted. So the final question that they asked was, was the posterior vitreous detachment, the PVD, that Mr. Green suffered in the look-back period directly related to the retinal detachment that occurred under cover? And that seemed like a pretty precise question, the exact question they should have asked the first time. Well, and respectfully, Your Honor, they were capable of doing so. Well, so what? I mean, if they're being incompetent, it doesn't mean that they were doing anything irregular, does it? Well, not irregular, Your Honor, but perhaps arbitrary and capricious. Okay. Incompetent equals arbitrary and capricious? I would say that the insurer does have the responsibility to their insurer to conduct a competent investigation. But this goes towards bias. We're talking about whether there's something that's in this is some indicia of bias, are we not? No, sir, we are. I would point out that they returned to Dr. Yannick with such frequency that they actually delayed the second determination, which I believe that Lena argues shows thoroughness and we argue shows a desire to elicit a basis for denial. So your point is they kept pounding on him until they got the answer they wanted? Yes, Your Honor. In addition, on the reduced deference element, the district court was also incorrect regarding the universality of the opinions of the doctors in this case. It stated explicitly that all five doctors in the record stated that the PVD was conclusively linked to the retinal detachment. And with respect, we disagree. First, our experts, the treating physician, Dr. Kenoff, and our expert, Dr. Wise, clearly distinguished between the two conditions. I thought that those doctors said it didn't cause. Yes. But that's not what we're talking about. The standard is broader than causing. The standard is whether it contributed to. Those are two different things, right? With respect, Your Honor, our belief is that there is a single causal link permitted under FOUT between the disability and the disabling condition. Does the language use more than one word? I mean, that phrase is in question. I'm going to pull it up here in a second. It doesn't just say cause, does it? In FOUT, sir? No. Or contributed to? No. So the language in the policy reads, Any period of disability caused or contributed to by or resulting from a pre-existing condition. Okay. And so your experts say it didn't cause it. Well, that doesn't answer the question of whether it contributed to, does it? No. But, sir, he couldn't state, none of the experts can say conclusively that it contributed to either. Posterior vitreous detachments occur with much greater frequency than retinal detachments. In fact, the vast majority of us will suffer one in a lifetime. They said it was likely. Their experts certainly said that it was likely. Did they not? He did, sir, but in no way did, so their original medical reviewer, Dr. Kamju, said that he, well, for example, he specifically reached out to the doctor who diagnosed the PVD, but made no attempt to speak to the doctor who diagnosed the retinal attachment. So there was no discussion with that diagnosing doctor of whether there was some other risk or possibility in Mr. Green's medical history that would have caused a retinal detachment to occur. Given the frequency of PVD and given the fact that the vast majority of cases resolve without even diagnosis, much less treatment, we can't say conclusively that those things were related. And because he didn't go to the doctor who actually diagnosed the retinal tear, or I mean, sorry, the retinal detachment, and asked for his opinion on that, it seems likely that Lena was looking for a basis on which it could deny this claim. We're under a substantial evidence standard. You've used the word conclusive more than once. Why do we have to find anything is conclusive? This Court does not have to find that anything is conclusive, Your Honor. You're correct. However, Lena, under its responsibilities to its insured, certainly has a responsibility to at least seek the opinion of the diagnosing and treating physician, which it did not do. In addition, Dr. Kamju misstated or, at the very least, failed to cite his supporting evidence from the American Academy of Ophthalmology. There is conflicting evidence in the record. Dr. Kamju states that the AAO's practice standards list as a risk factor for detachment a PVD. Dr. Wise, who actually cited two of those standards in his note, which Dr. Kamju did not, says that it is not listed as a risk factor for detachment. And even if we... Well, I mean, so it may not be listed, but everybody's different. Don't we know that? And so if they looked at this particular individual's situation, they could say in this case his PVD contributed to the retinal detachment. But in this case, Your Honor, nobody considered any other potential risk factor besides the PVD. Everyone is different. You're absolutely correct. And under Goetz, it states that these sorts of evaluations are incredibly fact-specific. But Meyer, which Lena took issue with in our brief, states explicitly that if an insurer wants to include risk factors, so if we assume that it is in fact a risk factor based on Dr. Kamju's report, Meyer specifically states that if insurers want to include risk factors as limiting under preexisting conditions, they are free to do so clearly such that their insurers can understand that. Meyer required the condition be the same, did it not? No, Meyer did not require that the condition be the same. They required that there be a substantial linkage between the two. So Lena has attempted to distinguish Meyer for the purposes of our case. But what's relevant under Meyer is that you look to what caused the disability and not leave to what caused the disabling condition. Well, you caused the disability. You're back to the word cause. Why is that word so determinative here? Well, for example, sir, PVD is not a risk factor for blindness. There is no way, no doctor has stated that. If it is a risk factor for retinal detachment, and retinal detachment leads to blindness, and you've got a contributing standard, I'm missing it. Why is there a link there? Aren't they talking generalities? Generally, it doesn't lead to that? In exceedingly rare cases, Your Honor, in fact, we don't actually know, and there was no evidence submitted by either side in the record of the likelihood that PVD would lead to a retinal detachment. Certainly there are other risk factors and many other ways that a retinal detachment can occur, and none of those were investigated by Lena in this case. I'd also like to just go forward saying that even if we accept the linkage that Lena has put forward between PVD and the retinal detachment, PVD still doesn't trigger the preexisting condition limitation because under FOUT, to permit the exclusion under this basis would be inappropriately to extend the breadth so that the limitation would swallow the benefit. And there are five intervening steps here, just as in FOUT? No, there are not five intervening steps, Your Honor. Hardly, right? So why is FOUT even relevant? Well, I believe, sir, it's because there is a presumptuous chain. So what each of the experts did, whether they were treating our patient on our side or on Lena's side, stated it's likely that the PVD then caused a tear, which then it's likely permitted the entry of vitreous gel, which then is likely to have caused the retinal detachment. So there are, if not five, intervening steps here, Your Honor. And I would just like to return to two specific cases that Lena relied on heavily, saying that the cases reviewed in FOUT were relevant and on point for our position here, the first, CASH, and the second, HOLSI. I'd just like to say that those cases are wholly distinguishable because in both CASH and HOLSI, the pre-existing condition had as a potential risk factor the ultimate condition, the ultimate disability, right? So in CASH, the court specifically stated that one needs diverticular disease in order to have diverticulitis. It's an absolute prerequisite. In HOLSI, all of the resources in that case stated that blindness is a common side effect of diabetes, and blindness was ultimately the disabling condition in that case. So here... Was the language in the policy in those cases like the broad language here? Yes, Your Honor, it was. And so I'd just like to say that in our view, Luna did not perform a satisfactory investigation of Mr. Green's claim and arbitrarily and capriciously denied him his coverage, and I'd like to reserve the remainder of my time. Thank you. Thank you. Good afternoon, Your Honors. Jackie Mingler, Jr., on behalf of Life Insurance Company of North America. The investigation was reasonable, and there was more than substantial evidence in this case to establish the requisite linkage between the PVD and the later retinal detachment, the disabling condition. Ms. Owen or Ms. Walker tries to, you know, overlook the evidence that Lina obtained. First of all, as she noted, they contacted the optometrist who diagnosed the PVD, and that optometrist, in his discussion with Dr. Kamju, agreed that the PVD likely caused the retinal attachment. He noted the linkage, and he noted the close time factor, and that there were no other risk factors other than the PVD. Then you have Dr. Kanoff, the treating physician who did the eye surgery on the retinal attachment. He said in his letter, quote, or he said that PVD, quote, is certainly a risk factor, close quote. So there you have a treating and diagnosing physician acknowledging that the PVD certainly is a risk factor. Then you have Dr. Kamju, the independent board-certified ophthalmologist whom Lina retained for use in the first appeal. Dr. Kamju said that the PVD most likely caused the later retinal detachment. He discussed the mechanism by which that happened, which was most certainly not attenuated. He described how the PVD would cause the vitreous gel to separate from the retina, lead to a tear. That allows liquid in, and then you get the retinal attachment. He didn't say it was the only way in which this could occur, but he identified it as a specific risk factor. And in the case of Mr. Green, with the PVD, followed less than three months later by the retinal detachment, he explained why the PVD was, as the district court said, a culprit in this retinal detachment. Then you have Dr. Wise, whom Mr. Green's counsel retained to be a peer review expert, and he said that the PVD was a prior event to the development. In other words, it's the same thing everybody else is saying. The PVD is an event that leads to the retinal detachment because of the way this mechanism works. Dr. Wise focused on cause. He said that the PVD did not cause the blindness. No one has ever said that is the case. That wasn't the issue here, as the honors have shown out or raised during this argument. The issue is, did the PVD contribute to it, and was it a close enough contributing factor that it's properly identified as a preexisting condition under the language of the plan and the precedent of this court? And the answer to those questions is yes. It's significant that Dr. Wise, the retained expert for them in the first appeal, and by this point they had access to Dr. Kamjoo's report. Dr. Wise didn't say Dr. Kamjoo's wrong. Dr. Wise didn't challenge Dr. Kamjoo's discussion of the mechanism.  But he had to acknowledge, as he must, a fact that no one has disputed, that the PVD is in fact a prior event in this not attenuated chain of events that leads to the retinal detachment and the blindness that results from it. And then finally we have Dr. Yannick. An interesting thing about Dr. Yannick is that there's been so much attention directed to the questions presented to him. And why should one not infer that you pounded on him until you got the answer you wanted? I mean, oh, this is my answer. Let me ask you a different way. I mean, it doesn't take rocket science to know that you're not giving you the answer you want, does it? Well, actually, Your Honor, all you have to do is read the report and the answer was already in the report. In the report, in the initial report, Dr. Yannick, in describing his findings about the evidence, described the PVD as a precedent condition that most likely caused the retinal detachment. And he went on to describe the mechanism in the link and he commented that the mechanism that Dr. Kanju had described was accurate. And so he didn't go into the same level of detail. And so Lina actually had in the report before it an opinion from Dr. Yannick about the PVD being this precedent condition most likely causing the later retinal detachment that really answered the question. Yes, but that really doesn't help you because I think the inquiry here is about bias. And if you've got an answer in the report that says A and you keep pounding on the person until they tell you B, doesn't that suggest, boy, I'm working really hard to get to B? Well, no, it doesn't, Your Honor. Why is that? Well, because for whatever reason, whether you want to call it incompetence, not thinking, or whatever, these questions were not artfully phrased. And as the district court pointed out, each question was very distinct and asking a different thing. The point that opposing counsel is trying to make, we might have a biased situation if the first question was, did the PVD cause or contribute to the blindness? And he said no. And then the second question was, well, let's put it to you this way. Could it be that if you thought about this a little harder, maybe this caused or contributed? And then you keep pounding on the guy. Give me the answer I want. But instead, all three questions were totally different. The first question was, did the medical treatment in the look-back period, back in the earlier period, did that medical treatment treat the later condition? Well, the answer's no. Because the later condition was the retinal detachment, which you didn't have yet. So it's a totally different question, totally irrelevant to really the issue. We don't know what was going on in the thought process of the person drafting it, but it wasn't well-drafted for whatever reason. Then the next question was just plain silly. The second question was, did the treatment or medical services in this look-back period cause the condition in February 2015? Did this treatment cause the retinal detachment? Well, of course not. I mean, it's a ridiculous question. Finally, the third question, as Your Honor Holmes pointed out, was the right question. Did the PVD cause or contribute or result in this retinal detachment? And Dr. Yaddick said yes, and I'm surprised in a way Dr. Yaddick didn't say, well yes, and if you'd read my report a month ago, you would have seen I've already said this. And then he described the mechanism in exactly the same way that Dr. Kamju had described it. So these questions don't amount to a hill of beans. They're totally distinct. The answers are what you would expect. And Dr. Kamju, Dr. Yaddick, excuse me, was responding to each question, answering it appropriately. It wasn't his job to try to figure out what they were asking. I mean, they asked him a question, he answered the question. The reason the answer to the question didn't help things is because the question was poorly drafted and it didn't relate to the issue of importance. It had nothing to do with bias. There's no way that these questions linked together in any way indicate bias. This case is dramatically different from the Myers case, for example, out of the District of Kansas, on which they placed great reliance. That's a case where the district judge just jumped off over the claim administrator, which I'm pleased to say wasn't my client, it wasn't my client, because they had used an on-staff doctor. The district court cited all sorts of examples that this on-staff doctor was biased and had given a biased report, and that the claim administrator had not gone out and sought independent review by someone outside the company. Those were the biggest factors in that case. It led the district court to give heavy weight to conflict of interest. It led the district court to dispute the conclusions and everything else on down the line, including the policy interpretation. And, of course, none of that is present in here. The decisions on which Lina relied were, first of all, Mr. Green's own treaters, Dr. Armand Jorin. I've said that wrong, but the first unit. Yes. The first guy. The first guy, Van, right. And then the second one, Dr. Wise, their retained expert, and Dr. Caniff. But, as I've already discussed and we've briefed, there was evidence from all three of those that actually supported the conclusion. And then the two independent peer review ophthalmologists. Board-certified, independent, and significantly, apart from disagreeing with their conclusion, there's nothing in the record to say that what they said was wrong. Most significantly from Dr. Wise, another independent peer physician retained by them in the appeal. And although Dr. Wise didn't have the report of Dr. Yannick, because that came later in the second appeal, he most certainly had the report of Dr. Kanju. And he could have rebutted it, criticized it, done anything. Instead, he didn't. He made his point about what the causal factor was, but he had to concede that there was this prior event factor there that leads us into whether or not the PVD contributed. And, you know, the critical factor here is this is an arbitrary and capricious standard of review case. And the precedent of this court is very clear on that point. Substantial evidence is more than a scintilla, but less than a preponderance of the evidence. And if the court looks at the decision and there's substantial evidence and it's a reasonable decision, this court has held on multiple occasions that the court must uphold that rule. And that's what the district court here did. And, of course, the court is not bound by the district court, and the court is not... You're not deciding whether or not the district judge was erroneous. You're making your own de novo review here. But his review is sort of a good benchmark. I mean, he made a very detailed, careful analysis of the evidence and found that there was reasonable evidence, there was nothing in the record to support the conduct of Wyna being arbitrary and capricious, and therefore he upheld it under the court's precedent relating to the deferential standard review. And when you conduct your own de novo review of the evidence administrative record, I would submit that the same conclusion should occur here. I have nothing further unless you have further questions for me, Your Honors. Thank you. Thank you, Your Honor. I have just a few short points to make, Your Honors. First, with all due respect to opposing counsel, we're not overlooking anything in the file. I think that it's of vital importance that, you know, with all the weight that they're placing on Dr. Kamji's report, that that doctor explicitly made zero effort to get in touch with the diagnoser of the actual disabling condition. There's nothing in the record that contradicts that. There's nothing that said he tried. Certainly, independent medical reviewers commonly state attempted to reach doctor, et cetera. But instead, they went straight to the preexisting condition diagnoser because that was the person who could provide a basis for denial. In addition, they... Well, they were looking at preexisting condition. So why would you start at the end to say, okay, we have retinal detachment? Because the diagnoser of the retinal detachment is the person most likely to give you the potential diagnostic factors of how that occurred. I would submit that he's the most important of the doctors in the entire treating set here. Is it key to think that you have the PVD occurring, was it three months before the retinal? How many months? Yes, roughly, Your Honor. That was diagnosed on December 4th, and the retinal detachment was diagnosed on February 25th of the following year. So almost exactly. And doesn't that indicate something, if there's a causal connection? Not necessarily, Your Honor. A PVD can resolve in as little as a month, in my understanding. And it's really, you know, given that there was zero investigation to any other potential factor, I think not perhaps as much as... It didn't resolve in a month here, did it? We don't know, Your Honor. You didn't see anyone in that intervening period of time who could state whether or not it had resolved. It certainly didn't worsen. He had no increased visual effects as one might have if they had developed a tear and then were experiencing the entrance of that viscerous gel. And did anyone indicate an intervening risk factor during this three-month period? There's no intervening risk factor in the record, Your Honor. Well, that's what we got, right? I understand, yes. I do want to draw your attention to the fact that with all the weight that they're putting on Dr. Kamji's report and his discussion with Dr. Van Amerogen, Dr. Amerogen would not have identified any risk factors for retinal detachment or anything like that in his treatment records of Mr. Green because Dr. Amerogen did not treat him for a retinal detachment and at that point said, this will resolve on its own. You have no problem. He also specifically stated in his notes that there was no tear present when he treated Mr. Green. I'd also like to point out on the question of the Dr. Yannick question, opposing counsel makes the point that Dr. Yannick stated in his original report the answer to the final question or the answer that they wanted, and therefore there's no evidence of bias in the inarticulate questions posed in the interim. However, if Dr. Yannick answered the way that they, Lena desired or at least in a way that it would accept in that report, then why did it persist in getting a specific answer to that question when it didn't with Dr. Kamji? So they posed a specific question. The first question of Dr. Yannick was the same as the question posed to Dr. Kamji. Dr. Kamji wrote a report that said what Lena would like it to say, that this was a preexisting condition, but they never hammered him for a specific answer on that question. And so I think that that greatly undermines the explanation of no bias or that there was no reason for going that direction. I have nothing further if the Court has any further questions. Hearing none. Thank you very much. Thank you. Thank you both for your arguments. This case is submitted. Court is in recess until 9 o'clock tomorrow. Thank you.